STATE OF NORTH CAROLINA v. GEORGE FRANKLIN PAGE

No. 239A96

(Filed 24 July 1997)

## 1. Indigent Persons § 19 (NCI4th)— capital murder—provision of forensic psychiatrist—denied—no particularized need

The trial court did not abuse its discretion in a capital first-degree murder prosecution by providing the State access to a forensic psychiatrist while denying defendant's request for the same type of expert. Defendant had available at trial both a psychiatric and a psychological expert who had treated him for an extended period prior to the shooting and the diagnosis of the State's expert was in accord with theirs except that she did not believe defendant suffered from post-traumatic stress disorder. Mere suspicion that the classification of the State's witness as a forensic psychiatrist made her better equipped than the defendant's psychologist to testify about defendant's mental status was insufficient to require that defendant be given a court-appointed forensic expert. Defendant did not demonstrate a particularized need for a forensic psychiatrist or a reasonable likelihood that such an expert would materially assist him in the preparation and presentation of his case.

**Am Jur 2d, Criminal Law §§ 955, 1006; Expert and Opinion Evidence § 13.**

**Right of indigent defendant in state criminal case to assistance of psychiatrist or psychologist. 85 ALR4th 19.**

## 2. Evidence and Witnesses § 2890.5 (NCI4th)— capital murder—defendant's psychologist—license revocation—not suppressed

A first-degree murder defendant was not denied his due-process guarantee of a competent mental-health expert by the denial of his motion *in limine* to suppress evidence of his psychologist's license revocation. The State was entitled to call into question the psychologist's credentials, as with any witness; defendant had another competent mental-health expert witness; and the State's forensic psychiatrist testified largely in accord with the testimony of defendant's experts. The denial of defend-

ant's motion did not have a prejudicial effect on his right to present his psychiatric defense.

**Am Jur 2d, Expert and Opinion Evidence §§ 142, 381.**

**3. Homicide § 523 (NCI4th)— second-degree murder—diminished mental capacity—not a defense to malice**

The trial court did not err in a murder prosecution by not instructing the jury that diminished mental capacity could negate the element of malice required for a second-degree murder. Second-degree murder is the unlawful killing of a human being with malice but without premeditation and deliberation and diminished capacity not amounting to legal insanity is not a defense to the element of malice in second-degree murder.

**Am Jur 2d, Criminal Law § 41; Expert and Opinion Evidence § 190; Homicide §§ 115, 516.**

**Appealability of orders or rulings, prior to final judgment in criminal case, as to accused's mental competency. 16 ALR3d 714.**

**Competency to stand trial of criminal defendant diagnosed as "mentally retarded"—modern cases. 23 ALR4th 493.**

**4. Assault and Battery § 60 (NCI4th)— assault on an officer—diminished capacity—not a defense—distinction between general intent and specific intent not abolished**

The trial court did not err by not instructing the jury to consider diminished mental capacity as a defense to seven counts of assault with a deadly weapon on a government officer. This felony may be described as a general-intent offense because the jury is not required to find that defendant possessed any intent beyond the intent to commit the unlawful act, which will be inferred or presumed from the act itself. Knowledge of the victim's status as a government officer is simply a fact that the State must prove; it is not a state of mind to which the diminished-capacity defense may be applied. Defendant's invitation to dispense with the distinction between specific-intent and general-intent crimes was declined; the diminished-capacity defense is not available to negate the general intent required for a conviction of assault with a deadly weapon on a government officer.

**Am Jur 2d, Criminal Law § 41; Homicide § 115.**

**Appealability of orders or rulings, prior to final judgment in criminal case, as to accused's mental competency. 16 ALR3d 714.**

**Competency to stand trial of criminal defendant diagnosed as "mentally retarded"—modern cases. 23 ALR4th 493.**

5. **Jury § 141 (NCI4th)— capital murder—jury selection—conception of parole eligibility**

The trial court did not err in a capital murder prosecution by denying defendant's pretrial motion to permit him to examine prospective jurors regarding their conception of parole eligibility when a defendant receives a life sentence. The trial court specifically instructed the jury that a separate sentencing hearing would be held if defendant was convicted of first-degree murder, gave the instruction that a sentence of life imprisonment means life without parole prior to jury selection, and reiterated it during jury selection. Defendant was not prevented from informing jury members that life imprisonment means life without parole and his counsel so indicated several times during the trial.

**Am Jur 2d, Jury §§ 198, 206; New Trial § 247.**

**Prejudicial effect of statement or instruction of court as to possibility of parole or pardon. 12 ALR3d 832.**

6. **Jury § 226 (NCI4th)— capital murder—jury selection—unequivocal opposition to death penalty—no opportunity to rehabilitate**

The trial court did not abuse its discretion in jury selection for a capital first-degree murder prosecution where defendant contended that he was not allowed to rehabilitate prospective jurors excused for cause based on opposition to the death penalty. In all but one instance, defendant either did not ask to rehabilitate or was unsuccessful in doing so and on the one occasion when defendant was denied *voir dire*, the prospective juror was unequivocal in his opposition to the death penalty. A defendant is not permitted to rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court.

**Am Jur 2d, Criminal Law § 685; Jury § 279.**

STATE v. PAGE

[346 N.C. 689 (1997)]

**Comment note.-Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**7. Criminal Law § 1402 (NCI4th Rev.)— death sentence—not disproportionate**

A sentence of death was not disproportionate where there was clear evidentiary support for the aggravating circumstances considered and found by the jury, the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor, and this case is distinguishable from the seven cases in which the death penalty was found disproportionate because none of those cases involved the first-degree murder of a police officer from a distance with a high-powered rifle while the officer was engaged in the performance of his duties. This case is similar to cases in which the death penalty was found proportionate.

**Am Jur 2d, Criminal Law § 628; Homicide § 556.**

**Propriety of imposing capital punishment on mentally retarded individuals. 20 ALR5th 177.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Albright, J., on 26 April 1996 in. Superior Court, Forsyth County. On 21 April 1997 this Court allowed defendant's motion to bypass the Court of Appeals on judgments entered upon related convictions. Heard in the Supreme Court 12 May 1997.

*Michael F. Easley, Attorney General, by Valérie B. Spalding, Assistant Attorney General, for the State.*

*Larry L. Eubanks, David B. Freedman, and Dudley A. Witt for defendant-appellant.*

WHICHARD, Justice.

On 31 July 1995 defendant was indicted for first-degree murder, eight counts of assault with a deadly weapon with intent to kill, and one count each of discharging a firearm into an occupied vehicle and discharging a firearm into an occupied dwelling. On 11 March 1996

superseding indictments were issued on seven of the eight charges of assault with a deadly weapon with intent to kill, changing the charges to assault with a deadly weapon on a government officer. Defendant was tried capitally at the 8 April 1996 Criminal Session of Superior Court, Forsyth County. The jury found him guilty of all charges. As to the murder conviction, the jury found defendant guilty on the basis of premeditation and deliberation and under the felony murder rule, specifically finding the seven assault with a deadly weapon on a government officer offenses as the underlying felonies, and recommended that he be sentenced to death. The trial court sentenced defendant accordingly. It also sentenced defendant to imprisonment for thirty-one to forty-seven months on the assault with a deadly weapon with intent to kill conviction, twenty-five to thirty-nine months on the discharging a firearm into an occupied vehicle conviction, and twenty-five to thirty-nine months on the discharging a firearm into an occupied dwelling conviction, the sentences to run consecutive to one another. The court arrested judgment on the assault with a deadly weapon on a government officer convictions. We hold that defendant received a fair trial, free of prejudicial error, and that the sentence of death is not disproportionate.

The State's evidence tended to show that at around 8:00 a.m. on 27 February 1995, Sandra McGill was sitting in her apartment when she heard a loud explosion coming from the bar counter. Because she was blind, McGill called maintenance personnel, who discovered that a bullet had gone through her fish tank. The shot was fired by defendant George Franklin Page, who was pointing a high-powered rifle out the window of his apartment directly opposite McGill's building. He fired another shot when the maintenance person, Ellis Hollowell, went outside to take a closer look at a hole in the vertical blinds; this shot hit the wall just above Hollowell's head. Shortly after 9:00 a.m. defendant fired a third shot into a moving vehicle, a cable van.

Police Officers E.A. Newsome, A.N. Swaim, M.R. Bollinger, and J.W. McKenzie of the Winston-Salem Police Department arrived after 9:00 a.m. to inspect McGill's apartment. While Swaim and Newsome were proceeding to defendant's building to question the residents, defendant fired two more shots. While the officers radioed for help, he again fired his rifle, and the officers all took cover. Several testified that they saw defendant moving from window to window.

Officers John Pratt and Stephen Amos arrived at the scene and drove directly to defendant's building. Amos was at the hood of the

car when defendant fired another shot that went through the patrol car's back window, then hit Amos in the chest. Pratt, along with officer Steven Sigmon and others, arrived and took Amos to the ambulance. Sigmon testified that he saw the muzzle flash and heard a shot that passed ten feet above his head.

Around 9:30 a.m. defendant called his ex-girlfriend, Tamara Mitchell, and stated that his apartment was surrounded by police officers and that he thought he had shot someone. At 10:00 a.m. Sergeant Marble, a crisis negotiator, called defendant. After discussion, defendant said he wanted to speak with his clinical psychologist, Dan Pollock, and his psychiatrist, Jason Crandell. Pollock spoke with defendant and implored him to surrender. Defendant told Marble the only people he wanted to approach his apartment were his ex-girlfriend and his "psych." Negotiations continued until 11:45 a.m. when defendant agreed to go, without weapons, with Crandell and Marble to Pollock's office. Defendant was taken into custody shortly thereafter. Marble testified that at the time of the arrest, defendant had no difficulty understanding what he was being told and was not delusional. Defendant told Marble he had been injured in Vietnam and wore a leg brace as a result.

Defendant introduced testimony from both Crandell and Pollock about his mental health. Pollock had treated defendant for several years and diagnosed him with a Cluster B personality disorder, extensive pain syndrome, and post-traumatic stress disorder with flashback symptoms resulting from experiences in Vietnam. Pollock also testified that defendant abused alcohol. Pollock opined that defendant was suffering from post-traumatic stress disorder at the time of the shooting and that because he was experiencing a flashback, defendant was unaware of his surroundings and the actual event.

Defendant also introduced testimony from Crandell. Pollock had referred him to Crandell in February 1994 for medication management of his post-traumatic stress disorder. Crandell also diagnosed defendant with chronic depression and chronic pain disorder as well as episodic alcohol abuse. Crandell testified that at the time of the arrest, defendant was suffering from an Axis II character disorder. This nonpsychotic disorder afflicted defendant on a daily basis; however, Crandell did not think it affected defendant's ability to formulate and carry out plans.

The State presented evidence from Nicole Wolfe, a forensic psychiatrist who evaluated defendant at Dorothea Dix Hospital after the

shooting. She diagnosed defendant with a personality disorder characterized by narcissistic and passive/aggressive traits. She also discovered that defendant had served in Vietnam for only one year and had not seen combat. Given these facts, she did not believe defendant suffered from post-traumatic stress disorder. She similarly testified that defendant had a history of alcohol abuse. Wolfe believed that defendant had the capacity to understand his actions during the shooting and that none of the diagnoses affected his mental abilities.

During the capital sentencing proceeding, the jury found as aggravating circumstances that defendant had committed the murder as part of a course of conduct that included defendant's commission of other violent crimes, that he murdered a law enforcement officer engaged in the performance of official duties, and that the murder was committed to hinder the enforcement of the laws. Four statutory mitigating circumstances were submitted, and the jury found two: that the murder was committed while defendant was under the influence of a mental or emotional disturbance and that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Finally, the jury found one of the six nonstatutory mitigating circumstances submitted: that defendant was under the voluntary care of both a psychiatrist and a psychologist on the day of the shooting. The jury found the mitigating circumstances insufficient to outweigh the aggravating circumstances and that the aggravating circumstances found, when considered with the mitigating circumstances found, were sufficiently substantial to call for the imposition of the death penalty.

In his first assignment of error, defendant makes two arguments. First, he argues that the trial court erred in denying his motion for a court-appointed psychiatrist. Second, he contends that denial of the motion *in limine* to suppress evidence of his psychologist's license revocation denied him his due-process guarantee to a competent mental health expert. We conclude that each argument is without merit.

Defendant presented testimony from Pollock, a clinical psychologist who had treated him for several years, and Crandell, a psychiatrist who had treated him for one year. Both characterized defendant as having a personality disorder and abusing alcohol, with Pollock making an additional diagnosis of post-traumatic stress disorder. The State's forensic psychiatric expert, Nicole Wolfe, disagreed with the

finding of post-traumatic stress disorder and agreed with the personality disorder diagnosis. On 7 March 1996 defendant moved for appointment of a third expert, a forensic psychiatrist, arguing that this type of expert was better equipped than a clinical psychologist to prepare a legal defense.

[1] Defendant first contends that the trial court erred in providing the State with access to a forensic psychiatrist while denying his request for the same type of expert. *Ake v. Oklahoma* established a defendant's right of access to a competent psychiatrist upon showing that "his sanity at the time of the offense is to be a significant factor at trial." 470 U.S. 68, 76, 84 L. Ed. 2d 53, 66 (1985). Following *Ake* this Court held that a defendant must be provided a " 'competent psychiatrist for the purpose of not only examining defendant but also assisting defendant in evaluating, preparing, and presenting his defense in both the guilt and sentencing phases.' " *State v. Parks*, 331 N.C. 649, 659, 417 S.E.2d 467, 473 (1992) (quoting *State v. Gambrell*, 318 N.C. 249, 259, 347 S.E.2d 390, 395 (1986)). While we have stated that both psychiatrists and psychologists are trained to recognize and treat mental illness, *State v. Bates*, 333 N.C. 523, 527, 428 S.E.2d 693, 695, *cert. denied*, 510 U.S. 984, 126 L. Ed. 2d 438 (1993), we have not specified that a particular type of mental-health expert must be appointed to assist a defendant in a criminal case to satisfy the requirements of *Ake*.

In accordance with *Ake*, this Court has held that upon a threshold showing of specific need for expert assistance, funds for such must be made available. *State v. Moore*, 321 N.C. 327, 347, 364 S.E.2d 648, 658 (1988). Further, the statutory right to "counsel and the other necessary expenses of representation," N.C.G.S. § 7A-450(b) (1989), includes the assistance of experts upon a showing of a particularized need therefor. *State v. Tucker*, 329 N.C. 709, 718, 407 S.E.2d 805, 811 (1991). The trial court has authority to approve a fee for the service of an expert witness who testifies for an indigent person. N.C.G.S. § 7A-454 (1989).

To establish a particularized need for expert assistance, a defendant must show that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that the expert will materially assist him in the preparation of his case. *State v. Phipps*, 331 N.C. 427, 446, 418 S.E.2d 178, 187 (1992). Although particularized need is a flexible concept and must be determined on a case-by-case basis, *Parks*, 331 N.C. at 656-57, 417 S.E.2d at 471,

STATE v. PAGE

[346 N.C. 689 (1997)]

"[m]ere hope or suspicion that favorable evidence is available is not enough to require that such help be provided," *State v. Holden*, 321 N.C. 125, 136, 362 S.E.2d 513, 522 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). The trial court has discretion to determine whether a defendant has made an adequate showing of particularized need. *State v. Mills*, 332 N.C. 392, 400, 420 S.E.2d 114, 117 (1992). In making its determination the trial court should consider all the facts and circumstances known to it at the time the motion for psychiatric assistance is made. *Gambrell*, 318 N.C. at 256, 347 S.E.2d at 394.

Applying these principles, we conclude that the court did not err in denying defendant's motion for psychiatric assistance. The ruling rested on several facts, including that defendant had both a psychiatric and a psychological expert providing evidence on his behalf at trial. Pollock and Crandell treated defendant over an extended period prior to the shooting, and they made similar diagnoses. Wolfe's diagnosis was in accord with theirs except that she did not believe defendant suffered from post-traumatic stress disorder. Defendant thus had substantial assistance from mental-health experts in preparing for and conducting his defense. Mere suspicion that Wolfe's classification as a forensic psychiatrist made her better equipped than Pollock to testify about defendant's mental status was insufficient to require that defendant be given a court-appointed forensic expert. Given the facts before the trial court when it made its ruling, we conclude that defendant did not demonstrate a particularized need for a forensic psychiatrist or a reasonable likelihood that such an expert would materially assist him in the preparation and presentation of his case. Accordingly, the trial court did not abuse its discretion in denying defendant's motion.

[2] Defendant next contends that denial of his motion *in limine* to suppress evidence of Pollock's license revocation discredited this expert witness and resulted in the denial of defendant's due-process guarantee of a competent mental-health expert.

North Carolina Rules of Evidence permit broad cross-examination of expert witnesses. N.C.G.S. § 8C-1, Rule 611(b) (1992). The State is permitted to question an expert to obtain further details with regard to his testimony on direct examination, to impeach the witness or attack his credibility, or to elicit new and different evidence relevant to the case as a whole. " 'The largest possible scope should be given,' and 'almost any question' may be put 'to test the value of his testimony.' " 1 Henry Brandis, Jr., *Brandis on*

*North Carolina Evidence* § 42 (3d ed. 1988) (footnotes omitted) (citations omitted).

*State v. Bacon*, 337 N.C. 66, 88, 446 S.E.2d 542, 553 (1994), *cert. denied*, —- U.S. —-, 130 L. Ed. 2d 1083 (1995). As with any witness, the State was entitled to call into question Pollock's credentials; thus, the court's denial of the motion *in limine* was proper. Further, defendant had another competent mental-health expert witness, and the State's forensic psychiatrist testified largely in accord with the testimony of defendant's mental-health experts. On these facts, denial of the motion *in limine* did not have a prejudicial effect on defendant's right to present his psychiatric defense. Accordingly, this assignment of error is overruled.

In his second assignment of error, defendant argues that the trial court erred in failing to instruct the jury on diminished capacity as to all charges submitted. The trial court instructed the jury to consider whether, because of diminished mental capacity, defendant was incapable of forming the specific intent to kill required for a conviction of first-degree murder by malice, premeditation, and deliberation. The trial court refused, however, to instruct the jury to consider whether diminished mental capacity prevented defendant from forming the intent required for a second-degree murder conviction or for conviction of the seven counts of assault with a deadly weapon on a government officer.

[3] Defendant contends the trial court should have instructed the jury that diminished mental capacity could negate the element of malice required for a second-degree murder conviction. We disagree. A defendant is entitled to present evidence that a diminished mental capacity not amounting to legal insanity negated his ability to form the specific intent to kill required for a first-degree murder conviction on the basis of premeditation and deliberation. *State v. Shank*, 322 N.C. 243, 249, 367 S.E.2d 639, 643 (1988). Further, a defendant who presents such evidence is entitled to a jury instruction on the diminished-capacity defense. *State v. Rose*, 323 N.C. 455, 458, 373 S.E.2d 426, 428 (1988). For a conviction of second-degree murder, however, the jury need not find that a defendant formed a specific intent to kill. Second-degree murder is the unlawful killing of a human being with malice but without premeditation and deliberation. N.C.G.S. § 14-17 (Supp. 1996); *State v. Lane*, 344 N.C. 618, 621, 476 S.E.2d 325, 327 (1996). Diminished capacity not amounting to legal insanity is not a defense to the element of malice in second-degree murder. *See Rose*,

323 N.C. at 458-59, 373 S.E.2d at 429. Therefore, the trial court did not err in refusing to instruct the jury to consider diminished capacity when it deliberated whether to convict defendant of second-degree murder.

**[4]** Defendant next argues that the trial court should have instructed the jury to consider diminished mental capacity as a defense to the seven counts of assault with a deadly weapon on a government officer. This offense is defined in N.C.G.S. § 14-34.2, which provides:

> [A]ny person who commits an assault with a firearm or any other deadly weapon upon an officer or employee of the State or of any political subdivision of the State . . . in the performance of his duties shall be guilty of a Class F felony.

N.C.G.S. § 14-34.2 (Supp. 1996). This Court has held that knowledge that the victim is an officer or employee of the State is an essential element of this offense. *State v. Avery*, 315 N.C. 1, 31, 337 S.E.2d 786, 803 (1985).

Defendant argues that the diminished-capacity defense should be available to negate the knowledge element required by *Avery*. This argument is without merit. We allow defendants to assert diminished mental capacity as a defense to a charge of premeditated and deliberate murder because we recognize that some mental conditions may impede a defendant's ability to form a specific intent to kill. *See Shank*, 322 N.C. at 250-51, 367 S.E.2d at 644. This reasoning is not applicable to the knowledge element of the felony of assault with a deadly weapon on a government officer. Knowledge of the victim's status as a government officer is simply a fact that the State must prove; it is not a state of mind to which the diminished-capacity defense may be applied. In this case, the State presented evidence tending to prove this fact. The trial court properly instructed the jury that, in order to convict defendant of these charges, it must find that defendant "knew or had reasonable grounds to know" that the victims were officers performing official duties. The State's evidence indicated that uniformed police officers and marked police cars were directly in defendant's line of vision. Several officers testified that defendant shot in their direction. Also, defendant's ex-girlfriend testified that she received a telephone call from defendant in which he stated that his apartment was surrounded by police officers. This evidence was sufficient to support the jury's conclusion that the knowledge element of assault with a deadly weapon on a government officer was satisfied.

Defendant argues further that the diminished-capacity defense should be available to negate the state of mind required for defendant to be convicted of a violation of N.C.G.S. 14-34.2. "In order to return a verdict of guilty of assault with a firearm upon a law enforcement officer in the performance of his duties, the jury is not required to find the defendant possessed any intent beyond the intent to commit the unlawful act, and this will be inferred or presumed from the act itself." *State v. Mayberry*, 38 N.C. App. 509, 513, 248 S.E.2d 402, 405 (1978). Thus, this felony may be described as a general-intent offense.

This Court has held that the diminished-capacity defense is not available to negate the general intent required for a conviction of first-degree sexual offense, *State v. Daughtry*, 340 N.C. 488, 516, 459 S.E.2d 747, 761 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 739 (1996), or of second-degree murder, *Rose*, 323 N.C. at 458-59, 373 S.E.2d at 429. Accordingly, we now hold that the diminished-capacity defense is not available to negate the general intent required for a conviction of assault with a deadly weapon on a government officer. Because the diminished-capacity defense is not available, the trial court did not err in refusing to instruct the jury on it.

Finally, defendant invites this Court to dispense with the distinction between specific-intent and general-intent crimes. This we decline to do. Defendant has proffered no compelling reason for us to change this long-standing rule. This assignment of error is overruled.

[5] In his next assignment of error, defendant makes two arguments. He first argues that the trial court erred in denying his pretrial motion to permit him to examine prospective jurors regarding their conception of parole eligibility when a defendant receives a life sentence. He contends that this violated his constitutional right to due process of law. The trial court specifically instructed the jury that if defendant was convicted of first-degree murder, a separate capital sentencing proceeding would be conducted to determine whether defendant would be given the death penalty or life without parole. Defendant, however, argues that these instructions were insufficient to ensure that jury members understood the meaning of life without parole.

Effective 1 October 1994, N.C.G.S. § 15A-2002 requires that the trial court instruct the jury "in words substantially equivalent to those of this section, that a sentence of life imprisonment means a sentence of life without parole." Further, this Court has repeatedly held that a defendant is not entitled to explore on *voir dire* prospective jurors' perceptions of parole eligibility. *State v. Conner*, 345 N.C. 319, 332,

480 S.E.2d 626, 631 (1997). The required instruction was given prior to jury selection and reiterated during jury selection. Further, defendant was not prevented from informing jury members that life imprisonment means life without parole, and his counsel so indicated several times during the trial. We thus adhere to our prior rulings and conclude that the trial court did not err in denying defendant's motion to permit him to question the prospective jurors on parole eligibility.

[6] Defendant next argues that the trial court erred in refusing to allow him to rehabilitate prospective jurors excused for cause based on their opposition to the death penalty. In all instances except one, defendant either did not ask to rehabilitate or was allowed to rehabilitate but was unsuccessful in doing so. On the one occasion when the court denied defendant *voir dire* of a prospective juror, the prospective juror was unequivocal in his opposition to the death penalty.

The trial court has broad discretion in supervising *voir dire*, and its judgment is deferred to when determining whether prospective jurors would be able to follow the law impartially. *State v. White*, 343 N.C. 378, 388, 471 S.E.2d 593, 598, *cert. denied*, — U.S. —, 136 L. Ed. 2d 229 (1996). Further, a defendant is not permitted to rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court. *State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990). Defendant has not met his burden of showing an abuse of discretion in the trial court's refusal to allow him to rehabilitate this juror. Accordingly, this assignment of error is overruled.

[7] In defendant's final assignment of error, he argues that the sentence of death was imposed under the influence of passion, prejudice, or other arbitrary considerations, and that the death penalty is disproportionate. Defendant does not argue that the jury's findings of the aggravating circumstances are unsupported by the evidence. This Court nonetheless is statutorily mandated to review all of these factors when a sentence of death is imposed. N.C.G.S. § 15A-2000(d)(2) (Supp. 1996).

The jury found three aggravating circumstances: that the murder was committed to hinder the enforcement of laws, N.C.G.S. § 15A-2000(e)(7); that the murder was committed against a law enforcement officer while he was engaged in the performance of his official duty, N.C.G.S. § 15A-2000(e)(8); and that the murder was com-

mitted as part of a course of conduct that included defendant's commission of other violent crimes, N.C.G.S. § 15A-2000(e)(11). The jury also found two of four statutory mitigating circumstances submitted: that the murder was committed while defendant was under the influence of a mental or emotional disturbance and that defendant did not have the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Of the six nonstatutory mitigating circumstances submitted, the jury found only that defendant was under the care of a psychiatrist and a psychologist. We find clear evidentiary support for the aggravating circumstances considered and found by the jury. Further, we conclude that the death penalty was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We thus turn to our final statutory duty of proportionality review.

Proportionality review serves to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury," *State v. Lee*, 335 N.C. 244, 294, 439 S.E.2d 547, 573, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994), and it guards "against the capricious or random imposition of the death penalty," *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In performing proportionality review, we compare this case to others that are roughly similar with regard to the crime and the defendant. *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

This Court has found death sentences disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We find the instant case distinguishable from each of these cases. None of these cases involved the first-degree murder of a police officer from a distance, with a high-powered rifle, and while the officer was engaged in the performance of his duties.

Defendant argues that his case is comparable to *Hill*. There the defendant was convicted of first-degree murder for killing a police

**STATE v. PAGE**

[346 N.C. 689 (1997)]

officer with the officer's gun after the two struggled. This Court vacated the sentence of death because of speculative evidence about what the defendant was doing prior to his encounter with the officer and lack of evidence as to who drew the murder weapon out of the officer's holster. We find the present case distinguishable from *Hill* in several respects. First, defendant stood at the window of his apartment and used his own rifle to kill the officer as the officer stood by the hood of his car. Second, prior to the encounter, defendant had shot into the home of a blind woman and at a moving cable van. Third, after shooting the officer, defendant continued to shoot in the direction of other officers at the scene. Fourth, the jury convicted defendant of first-degree murder on the theories of premeditation and deliberation as well as under the felony murder rule. The finding of premeditation and deliberation "indicates a more calculated and cold-blooded crime." *State v. Davis*, 340 N.C. 1, 31, 455 S.E.2d 627, 643, *cert. denied*, — U.S. —, 133 L. Ed. 2d 83 (1995). The jury also found that the murder was committed to hinder law enforcement and that it was committed against an officer in the line of duty.

This case is similar to cases in which we have found the death penalty proportionate. In *State v. Harden*, 344 N.C. 542, 476 S.E.2d 658 (1996), we affirmed a sentence of death where the defendant shot two police officers who were trying to arrest him. The jury there found the same three aggravating circumstances found here and one of the mitigating circumstances found here. *Id.* at 565, 476 S.E.2d at 670; *see also State v. Allen*, 323 N.C. 208, 372 S.E.2d 855 (1988), *judgment vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990). We conclude that this case is similar to cases in which we have found the sentence of death proportionate and not similar to any case where we have found the death penalty disproportionate.

We conclude that the death sentence was not excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.