MURPHY, Judge.
 

 *198
 
 Daniel Mylett ("Defendant") appeals from his conviction for assault on a government officer. On appeal, he contends that the trial court
 
 *199
 
 erred by (1) denying his motion for a continuance; and (2) denying his motions to dismiss. Specifically, he argues that the trial court should have granted his motion for a continuance so that he could prepare a motion to dismiss on the basis that video footage of the assault recorded on officers' body cameras was destroyed prior to trial in violation of
 
 Brady v. Maryland
 
 ,
 
 373 U.S. 83
 
 ,
 
 83 S.Ct. 1194
 
 ,
 
 10 L.Ed.2d 215
 
 (1963).
 

 He further asserts that, because he did not intend to assault a government officer, but instead intended to assault civilians standing behind the officer, the charge of assault on a government officer in violation of N.C.G.S. § 14-33(c)(4) (2015) was erroneously submitted to the jury as the State failed to establish the requisite intent element of the offense. After careful review, we reject Defendant's arguments and conclude that he received a fair trial free from error.
 

 *421
 

 Factual Background
 

 At 1:37 a.m. on 29 August 2015, Officer Jason Lolies ("Officer Lolies") and Officer Forrest ("Officer Forrest") with the Boone Police Department responded to a call regarding a male who was bleeding from his head at 200 Misty Lane in Boone, North Carolina. Upon arriving at the Misty Lane address, Officers Lolies and Forrest encountered several hundred individuals, most of whom were college-aged.
 

 Officer Lolies recalled that "[a]s we got to the crest of the hill, the driveway, that's when we heard a commotion and it sounded like some arguments, some screaming, some fighting sort of" coming from a smaller group of approximately 30 individuals. Upon investigation, Officer Lolies observed "people pushing and shoving over top of [Defendant]" who was "laying on the ground." Officer Lolies continued that "[i]t appeared that some of the people were trying to defend [Defendant] and there was obviously people trying to attack him[.]"
 

 The officers moved in to break up the altercation, and, after subduing the combatants, were approached by Defendant's girlfriend, Kathryn Palmer ("Palmer"), who informed them that Defendant was bleeding from his head. Officer Lolies then went over to Defendant and observed that both of Defendant's eyes were bleeding and that he had bruising and a large knot developing over his left eye.
 

 Defendant then jumped up from the ground where he was lying, acted aggressively towards Officer Lolies, and told him "to do [his] motherfucking job." While Defendant was yelling at him, Officer Lolies detected a strong odor of alcohol on his breath. Defendant then explained
 
 *200
 
 to Officer Lolies that the reason he had been beaten was because he had tried to stop Palmer from dancing with another man.
 

 Shortly thereafter, Officer Dennis O'Neal ("Officer O'Neal") arrived on the scene to assist Officers Lolies and Forrest. Officers Lolies and Forrest attempted to question several other individuals on hand, but were unable to do so because "[Defendant] was pretty erratically challenging people to fights. He would call them pussies, just very loud" and "[h]e charged at a couple of people a couple of different times and Officer Forrest, and eventually when Officer O'Neal arrived on the scene they would restrain him to prevent him from doing that." Defendant continued to verbally berate Officers Lolies, Forrest, and O'Neal by "telling [them] as law enforcement officers to do [their] ... motherfucking jobs."
 

 The officers called for an ambulance for Defendant, and, upon its arrival, Officer O'Neal directed Defendant into the back of the vehicle. Defendant initially complied, but proceeded to exit abruptly from the ambulance. Defendant resumed swearing at the officers and challenging nearby individuals to fight him.
 

 Officer O'Neal positioned himself between Defendant and these individuals and at that point Defendant "attempted to spit at folks that were walking behind, behind [Officer O'Neal's] location, over [his] shoulder." Defendant's spit made contact with the left side of Officer O'Neal's face and shirt. Defendant spat two additional times, despite Officer O'Neal ordering him to stop, again hitting Officer O'Neal in his face and on his shirt.
 

 Officer O'Neal ultimately corralled Defendant back into the ambulance and rode with him to Watauga Medical Center to receive treatment for his injuries. Defendant continued swearing at and verbally berating Officer O'Neal in the ambulance and at one point "stood up in the back of ... the ambulance, off the gurney, and began punching the interior walls of the ambulance" prompting Officer O'Neal to restrain him until they reached the hospital. Later that day, a warrant was issued and Defendant was arrested for assault on a government officer in connection with his spitting on Officer O'Neal.
 

 Prior to Defendant's district court trial, his original trial counsel received copies of video recordings taken on the officers' body-cams of the events surrounding the 29 August 2015 altercation at 200 Misty Lane. However, counsel opted not to obtain copies or use the footage at trial. After counsel's review, the original recordings were destroyed in accordance with the Boone Police Department's evidence retention schedule.
 

 *422
 

 *201
 
 On 9 November 2015, Defendant was tried before the Honorable Rebecca E. Eggers-Gryder in Watauga County District Court. That same day, Judge Eggers-Gryder found Defendant guilty of assault on a government officer and sentenced him to 60 days imprisonment, suspended sentence, and placed him on 12 months supervised probation. On 12 November 2015, Defendant appealed to superior court for a trial
 
 de novo
 
 .
 

 A jury trial was held in Watauga County Superior Court before the Honorable Alan Z. Thornburg from 29 March 2016 through 31 March 2016. Prior to the jury being empaneled, Defendant's new trial counsel moved for a continuance on the ground that counsel wished to prepare a motion to dismiss since the video recordings of the events of 29 August 2015 taken on the officers' body cameras had been destroyed and were therefore unavailable for use by the defense. After hearing arguments from defense counsel and the State, the trial court ultimately denied the motion. Significantly, no motion was filed in District Court relating to the videos and defense counsel did not move to dismiss on this ground in the four and a half months prior to the trial in Superior Court.
 
 [1]
 

 At trial, the State proceeded on a theory of transferred intent as to the assault on an government officer charge. To this end, it elicited testimony from, among other witnesses, Officers Lolies and O'Neal.
 

 Officer O'Neal testified as follows concerning the spitting incident:
 

 Q. I'm sorry-but was he just talking loudly and a little bit of spit came out or was he actually projecting spit?
 

 A. He was attempting-or projected, projecting spit attempting to hit folks that were walking behind me.
 

 Q. And when it hit you was it just a little driplet (sic) or was it a lot of liquid?
 

 A. If you know it was like the, you know, what a sneeze feels like, you know, a sneeze will make you feel the droplets on your face and you can see you got some stuff on your shirt.
 

 Q. And how about the third time, did that hit you?
 

 *202
 
 A. Yes, sir, it did, but it was, there wasn't near as much, you know, liquid, or I couldn't feel as much on the third time.
 

 ....
 

 Q. And what did you do at that point?
 

 A. I asked him to stop. I said, please stop, you know, I commanded, you know, stop spitting.
 

 Q. And the second time did you hear the sound beforehand?
 

 A. Yes.
 

 Q. All right. And where did you get hit?
 

 A. It would have been right here on my uniform shirt.
 

 Q. Did any of it actually go over your shoulder?
 

 A. Sir, I don't know that.
 

 Q. And the third time you said was it still-
 

 A. Yes.
 

 Q. And was he trying to kind of get around you to spit?
 

 A. Yes, yes he was.
 

 Officer Lolies, in turn, testified as follows concerning the spitting incident:
 

 Q. So I think I asked you, what happened, did anything draw your attention to Officer O'Neal and the Defendant at some point later, once the ambulance arrived?
 

 A. Yes, sir. I had three people over here, basically detained at this point, but I intended on placing them under arrest when I got the chance. And I was dealing with them, especially the one that ran so much. But I heard Officer O'Neal, who was dealing with [Defendant] at the time, ask the question to the effect of, I don't remember the exact words, but did you just spit on me.
 

 Q. And what did you do when you heard that?
 

 A. I looked over at Officer O'Neal, made sure he was okay, I didn't go over there and assist him or anything, but I just kept
 
 *423
 
 my eye on them to watch them to make sure that they were okay. And I continued to deal with these three people here.
 
 *203
 
 Q. Did you see Officer O'Neal right after he said that do anything?
 

 A. He made a gesture across the top of his uniform.
 

 Q. And what did that gesture appear to you to be?
 

 MR. ISAACS: Objection.
 

 THE COURT: Overruled.
 

 A. It appeared to me that he was wiping something off of his uniform.
 

 Q. Could you tell if anyone else was around Officer O'Neal and the defendant when that incident occurred?
 

 A. There was some other people around, I feel like it may have been his girlfriend and his brother, and there seemed to be two males who were giving this information in support of [Defendant's] statements and sort of his recollection of events, but there was also some people from the opposing party gathered around. And it seemed to me that these people in the background were taunting each other.
 

 Q. And the people that you thought were taunting each other for the opposing party, where were they standing in relation to Officer O'Neal?
 

 A. They were all around. We were intermingled with all these people.
 

 Defendant moved to dismiss the charge of assault on a government officer at the close of the State's evidence and renewed his motion at the close of all the evidence. The trial court denied both motions.
 

 The jury found Defendant guilty of assault on a government officer. The trial court sentenced Defendant to ten days imprisonment to be served over five consecutive weekends and ordered Defendant to pay costs in the amount of $1,657.50. It is from this judgment that Defendant appeals.
 

 Analysis
 

 I.
 
 Motion for Continuance
 

 Defendant initially argues on appeal that the trial court erred by denying his motion for a continuance. Specifically, Defendant claims he should have been allowed additional time to file a motion due to the destruction of the officers' body camera video recordings of the events
 
 *204
 
 of 29 August 2015 amounting to a
 
 Brady
 
 violation. We disagree. "A motion for a continuance is generally a matter within the trial court's discretion, and a denial is not error absent an abuse of that discretion. Defendant, therefore, bears the burden of showing that the trial court's ruling was so arbitrary that it could not have been the result of a reasoned decision."
 
 State v. Carter
 
 ,
 
 184 N.C.App. 706
 
 , 711,
 
 646 S.E.2d 846
 
 , 850 (2007) (internal citations and quotation marks omitted). The trial court did not abuse its discretion.
 

 "In
 
 Brady
 

 ,
 
 the United States Supreme Court held that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. This includes evidence known only to police investigators and not to the prosecutor. The duty to disclose such evidence is applicable even though there has been no request by the accused."
 
 State v. Dorman
 
 ,
 
 225 N.C.App. 599
 
 , 620,
 
 737 S.E.2d 452
 
 , 466 (internal citations, quotation marks, and brackets omitted),
 
 appeal dismissed and disc. review denied
 
 ,
 
 366 N.C. 594
 
 ,
 
 743 S.E.2d 206
 
 (2013).
 

 To establish a
 
 Brady
 
 violation, a defendant must show (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial. Favorable evidence can be either exculpatory or useful in impeaching the State's evidence. Evidence is considered material if there is a reasonable probability of a different result had the evidence been disclosed. A reasonable probability is a probability sufficient to undermine confidence in the outcome. However, when the evidence is only potentially useful or when no more can be said of the evidence than that it could have been subjected to tests, the results of which might have exonerated the defendant, the State's failure to preserve the evidence does not violate the defendant's constitutional rights unless a defendant
 
 *424
 
 can show bad faith on the part of the State.
 

 Id.
 
 at 620-21,
 
 737 S.E.2d at 466
 
 (internal citations, quotation marks, and brackets omitted).
 

 In the present case, the record clearly establishes that the recordings at issue were erased in routine conformity with the Boone Police Department's evidence retention schedule. It is undisputed that prior to their destruction, the recordings were reviewed by both Defendant's
 
 *205
 
 original counsel
 
 [2]
 
 and the prosecutor. Defense counsel's decision not to make or preserve copies of the videos-regardless of counsel's reason for declining to do so-cannot serve as a basis for arguing a
 
 Brady
 
 violation was committed by the State.
 
 See
 

 State v. Jennings
 
 ,
 
 333 N.C. 579
 
 , 604,
 
 430 S.E.2d 188
 
 , 200 ("The law is ... clear, however, that '[a] defendant is not prejudiced ... by error resulting from his own conduct.' " (quoting N.C.G.S. § 15A-1443(c) )),
 
 cert. denied
 
 ,
 
 510 U.S. 1028
 
 ,
 
 114 S.Ct. 644
 
 ,
 
 126 L.Ed.2d 602
 
 (1993). Consequently, as nothing in the record tends to demonstrate that the Boone Police Department or the State suppressed evidence or otherwise acted in bad faith, Defendant has failed to carry his burden in establishing a due process violation under
 
 Brady
 
 .
 

 In addition to Defendant's inability to demonstrate that a
 
 Brady
 
 violation occurred, it is also worth emphasizing that he has failed to establish precisely how a continuance would have enabled him to better prepare for trial given that it is undisputed that no copies of the videos remain in existence. Therefore, as a functional matter, the granting of a continuance by the trial court would have served no operative purpose.
 
 See
 

 State v. Gray
 
 ,
 
 234 N.C.App. 197
 
 , 201-02,
 
 758 S.E.2d 699
 
 , 702-03 (2014) ("To establish that the trial court's failure to give additional time to prepare constituted a constitutional violation, defendant must show how his case would have been better prepared had the continuance been granted or that he was materially prejudiced by the denial of his motion." (citation and quotation marks omitted)),
 
 disc. review improvidently allowed
 
 ,
 
 368 N.C. 324
 
 ,
 
 776 S.E.2d 681
 
 (2015).
 

 For all of these reasons, the trial court did not err in denying Defendant's motion for a continuance. Defendant's arguments on this issue are meritless.
 

 II.
 
 Assault on a Government Officer
 

 Defendant's final argument on appeal is that the trial court erred by denying his motions to dismiss the charge of assault on a government officer. Specifically, Defendant contends that, because the evidence at trial tended to establish that he intended to assault civilians standing behind Officer O'Neal and not Officer O'Neal himself, the State failed to establish the knowledge element of N.C.G.S. § 14-33(c)(4). We disagree.
 

 The trial court's denial of a motion to dismiss is reviewed
 
 de novo
 
 on appeal. Upon defendant's motion for dismissal,
 
 *206
 
 the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.
 

 State v. Williams
 
 , --- N.C.App. ----, ----,
 
 784 S.E.2d 232
 
 , 233 (citation omitted),
 
 disc. review denied
 
 ,
 
 369 N.C. 37
 
 ,
 
 792 S.E.2d 503
 
 (2016).
 

 N.C.G.S. § 14-33(c)(4) provides that
 

 (c) Unless the conduct is covered under some other provision of law providing greater punishment, any person who commits any assault, assault and battery, or affray is guilty of a Class A1 misdemeanor if, in the course of the assault, assault and battery, or affray, he or she:
 

 ....
 

 (4) Assaults an officer or employee of the State or any political subdivision of the State, when the officer or employee is discharging or attempting to discharge his official duties[.]
 

 *425
 
 "It is well established that this Court's principal aim when interpreting statutes is to effectuate the purpose of the legislature in enacting the statute, and that statutory interpretation properly begins with an examination of the plain words of the statute."
 
 State v. Williams
 
 ,
 
 232 N.C.App. 152
 
 , 158,
 
 754 S.E.2d 418
 
 , 423 (internal citations, quotation marks, and brackets omitted),
 
 appeal dismissed and disc. review denied
 
 ,
 
 367 N.C. 784
 
 ,
 
 766 S.E.2d 846
 
 (2014).
 

 It is fundamental that
 

 [t]he primary objective of statutory interpretation is to ascertain and effectuate the intent of the legislature. If the language of the statute is clear and is not ambiguous, we must conclude that the legislature intended the statute to be implemented according to the plain meaning of its terms. Thus, in effectuating legislative intent, it is our duty to give effect to the words actually used in a statute and not to delete words used or to insert words not used.
 

 Lunsford v. Mills
 
 ,
 
 367 N.C. 618
 
 , 623,
 
 766 S.E.2d 297
 
 , 301 (2014) (internal citations and quotation marks omitted). Moreover, "[w]here ... the General Assembly includes particular language in one section of a statute but omits it in another section of the same Act, it is generally
 
 *207
 
 presumed that the legislative body acts intentionally and purposely in the disparate inclusion or exclusion."
 
 Comstock v. Comstock
 
 , --- N.C.App. ----, ----,
 
 780 S.E.2d 183
 
 , 186 (2015) (citation, quotation marks, and brackets omitted).
 

 Significantly, the Legislature did not choose to include a reference to intent in authoring N.C.G.S. § 14-33(c)(4) despite the fact that it did so in other sections of Article 8, Subchapter III of Chapter 14 of the North Carolina General Statutes concerning criminal assaults.
 
 See
 
 ,
 
 e.g.
 
 , N.C.G.S. § 14-32(a) (2015) ("Any person who assaults another person with a deadly weapon with
 
 intent
 
 to kill and inflicts serious injury shall be punished as a Class C felon." (emphasis added)). Nor has this Court specifically delineated a scienter requirement in its discussion of the offense of assault on a government officer. Instead, we have simply stated that "[t]he essential elements of a charge of assault on a government official are: (1) an assault (2) on a government official (3) in the actual or attempted discharge of his duties."
 
 State v. Noel
 
 ,
 
 202 N.C.App. 715
 
 , 718,
 
 690 S.E.2d 10
 
 , 13,
 
 disc. review denied
 
 ,
 
 364 N.C. 246
 
 ,
 
 699 S.E.2d 642
 
 (2010).
 

 Defendant concedes that he did, in fact, commit an assault and that Officer O'Neal was a law enforcement officer discharging his duty. Therefore, we need only address whether assault on a government officer in violation of N.C.G.S. § 14-33(c)(4) is a general intent or, alternatively, a specific intent crime.
 

 Nonetheless, Defendant maintains that, even assuming he knew that Officer O'Neal was a police officer discharging a duty of his office at the time of the assault, the State failed to provide sufficient evidence that he
 
 intended
 
 to assault Officer O'Neal. Essentially, he asserts that all of the evidence tended to show that he intended to assault one or more civilians standing behind Officer O'Neal, and not Officer O'Neal himself, thereby precluding him from being found guilty of the offense of assault on a government officer.
 

 We find our Supreme Court's decision in
 
 State v. Page
 
 ,
 
 346 N.C. 689
 
 ,
 
 488 S.E.2d 225
 
 (1997),
 
 cert. denied
 
 ,
 
 522 U.S. 1056
 
 ,
 
 118 S.Ct. 710
 
 ,
 
 139 L.Ed.2d 651
 
 (1998), instructive on this point. In
 
 Page
 
 , the defendant was convicted of first-degree murder and assault with a deadly weapon on government officers for firing a high-powered rifle at several officers, one of whom was hit and subsequently died from his gunshot wound.
 

 Id.
 

 at 692-94
 
 ,
 
 488 S.E.2d at 228
 
 . At trial, Page asserted that he was suffering from post-traumatic stress disorder at the time he shot at the officers and requested a jury instruction on diminished capacity in order to attempt to repudiate the knowledge element of N.C.G.S. § 14-34.2.
 

 *208
 

 Id.
 
 at 694,
 
 488 S.E.2d at 229
 
 . The trial court declined to provide such an instruction and Page was ultimately sentenced to death.
 
 Id.
 
 at 698,
 
 488 S.E.2d at 231
 
 .
 

 On direct appeal to our Supreme Court, Page argued that the jury should have been instructed on diminished capacity in order to negate the knowledge element of N.C.G.S. § 14-34.2. The Court rejected this argument stating the following:
 

 *426
 
 This Court has held that knowledge that the victim is an officer or employee of the State is an essential element of this offense.
 
 State v. Avery,
 

 315 N.C. 1
 
 , 31,
 
 337 S.E.2d 786
 
 , 803 (1985).
 

 [Page] argues that the diminished-capacity defense should be available to negate the knowledge element required by
 
 Avery
 
 . This argument is without merit. We allow defendants to assert diminished mental capacity as a defense to a charge of premeditated and deliberate murder because we recognize that some mental conditions may impede a defendant's ability to form a specific intent to kill.
 
 See
 
 [
 
 State v.
 
 ]
 
 Shank
 
 , 322 N.C. [243] at 250-51, 367 S.E.2d [639] at 644 [1988].
 
 This reasoning is not applicable to the knowledge element of the felony of assault with a deadly weapon on a government officer. Knowledge of the victim's status as a government officer is simply a fact that the State must prove; it is not a state of mind to which the diminished-capacity defense may be applied.
 
 In this case, the State presented evidence tending to prove this fact. The trial court properly instructed the jury that, in order to convict [Page] of these charges, it must find that [Page] "knew or had reasonable grounds to know" that the victims were officers performing official duties. The State's evidence indicated that uniformed police officers and marked police cars were directly in [Page's] line of vision. Several officers testified that defendant shot in their direction. Also, defendant's ex-girlfriend testified that she received a telephone call from [Page] in which he stated that his apartment was surrounded by police officers. This evidence was sufficient to support the jury's conclusion that the knowledge element of assault with a deadly weapon on a government officer was satisfied.
 

 [Page] argues further that the diminished-capacity defense should be available to negate the state of mind required
 
 *209
 
 for defendant to be convicted of a violation of N.C.G.S. 14-34.2. "In order to return a verdict of guilty of assault with a firearm upon a law enforcement officer in the performance of his duties, the jury is not required to find the defendant possessed any intent beyond the intent to commit the unlawful act, and this will be inferred or presumed from the act itself."
 
 State v. Mayberry,
 

 38 N.C.App. 509
 
 , 513,
 
 248 S.E.2d 402
 
 , 405 (1978).
 
 Thus, this felony may be described as a general-intent offense
 
 .
 

 Id.
 
 at 699-700,
 
 488 S.E.2d at 232
 
 (emphasis added).
 

 While
 
 Page
 
 concerns an assault with a deadly weapon on a government officer, we find its reasoning to be equally applicable to the offense of assault on a government officer. Indeed, the only substantive difference between N.C.G.S. § 14-33(c)(4) and N.C.G.S. § 14-34.2 is that the latter requires that the assault be committed with a firearm. We therefore hold, in accordance with
 
 Page
 
 , that assault on a government officer is a general intent crime. As such, we are satisfied that when Defendant spat at members of the crowd and Officer O'Neal was struck by Defendant's spit, the requirements of N.C.G.S. § 14-33(c)(4) were satisfied as, for the reasons stated above, the State clearly established-and indeed Defendant conceded at oral argument-that Defendant knew Officer O'Neal was a law enforcement officer and Defendant intended to commit an assault.
 

 Were we to endorse Defendant's argument and construe N.C.G.S. § 14-33(c)(4) as necessitating specific intent-as opposed to general intent-the intrinsic purpose of the statute would necessarily be defeated. Therefore, we expressly hold that the knowledge element of assault on a government officer in violation of N.C.G.S. § 14-33(c)(4) is satisfied whenever a defendant while in the course of assaulting another individual instead assaults an individual he knows, or reasonably should know, is a government officer. Defendant's argument on this issue is consequently dismissed.
 

 Conclusion
 

 For the reasons stated above, we conclude that Defendant received a fair trial free from error.
 

 NO ERROR.
 

 Chief Judge McGEE and Judge DAVIS concur.
 

 [1]
 

 Although appellate counsel for Defendant argued for the first time at oral argument that Defendant's original counsel had subpoenaed the videos, the record is silent as to the issuance of any subpoenas by Defendant at any stage.
 

 [2]
 

 Although the record is vague on this point, it appears that Defendant's original counsel, Shannon Aldous, was replaced as counsel by Kenneth D. Isaacs sometime after Defendant was found guilty in District Court and prior to his trial
 
 de novo
 
 in Superior Court.