IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-221

Filed 4 June 2025

Brunswick County, No. 18 CRS 54520

STATE OF NORTH CAROLINA

v.

JULIA LOUISE COPENHAVER

Appeal by Defendant from Judgment entered 30 May 2023 by Judge Jason C. Disbrow in Brunswick County Superior Court. Heard in the Court of Appeals 30 January 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Michael T. Henry, for the State.*

*Parry Law, PLLC, by Edward Eldred, for Defendant-Appellant.*

STADING, Judge, delivers the opinion of the Court in part II and announces the judgment of the Court, in which Judge FLOOD concurs and Judge HAMPSON concurs in part and dissents in part by separate opinion. HAMPSON, Judge, delivers the opinion of the Court in part I in which Judges FLOOD and STADING concur.

I.

HAMPSON, Judge.

**Factual and Procedural Background**

Julia Louise Copenhaver (Defendant) appeals from a Judgment entered upon a jury verdict finding her guilty of First-Degree Murder. The Record before us tends to reflect the following:

Following Hurricane Florence, Defendant's mother, Susan Copenhaver, went to the family's vacation home in Oak Island, North Carolina, alone to inspect it for damage on 24 October 2018. She spoke with Defendant's aunt by phone around 9:30 p.m., and they discussed that Defendant had recently left her Virginia home—where she had been staying—without explanation and was not responding to calls or text messages.

On 25 October 2018, Officers William Bopst and Lloyd Hames with the Oak Island Police Department went to the family's vacation home to conduct a welfare check because Defendant's family believed something was wrong. According to Officer Bopst, Defendant's family had called 911 and reported Defendant had told them her mother had attacked her and was deceased and in the closet. When Officers Bopst and Hames arrived, Defendant answered the door and told Officer Bopst her mother had attacked her. Officer Bopst asked where Defendant's mother was and Defendant pointed toward a bedroom. The officers found Defendant's mother's body in the closet; she had been stabbed approximately 95 times and also suffered "blunt force injuries".

At the scene, Defendant was "calm" and "[q]uiet." However, after Defendant was taken into custody and brought to a detention center, she became "extremely

agitated" and had to be secured in a restraint chair.

Upon motion of defense counsel, the trial court committed Defendant to Central Regional Hospital for preparation of a mental health report. On 20 August 2019, Dr. Teresa Wise, a clinical psychologist, submitted a report concluding Defendant was incapable of proceeding to trial. Based on this report, the trial court found there were reasonable grounds to believe Defendant was incapable of proceeding to trial and committed her to Cherry Hospital for treatment and capacity restoration. On 4 May 2020, the trial court was notified Defendant's capacity had been restored. After this, however, her mental state "declined significantly". A report prepared by Dr. Wise on 8 July 2021 found Defendant had "persistent deficiencies in understanding the facts and evidence relating to her charges." The trial court concluded Defended was incapable of proceeding and committed her again to Cherry Hospital for capacity restoration. On 20 December 2022, Dr. Holly Manley, Senior Psychologist with Cherry Hospital, submitted a report concluding Defendant was capable of proceeding. On 6 January 2023, the trial court found Defendant was capable of proceeding.

In March 2023, Defendant gave notice of her intent to present a defense of diminished capacity. Defense counsel had previously advised Defendant to plead not guilty by reason of insanity (NGRI), but Defendant rejected that defense. On 23 May 2023, the morning of trial, defense counsel informed the trial court that Defendant still intended to present a diminished capacity defense. Defense counsel stated she

had discussed the differences between NGRI and diminished capacity with Defendant at length. This included explaining to Defendant that asserting diminished capacity required admitting to killing the victim but disputing the ability to form the specific intent required for first-degree murder.

The trial court conducted a colloquy to ensure Defendant understood asserting a defense of diminished capacity involved admitting she was "responsible for the death of the victim." Responding to Defendant's questions around receiving instructions for lesser offenses than second-degree murder, the trial court explained that whether Defendant would receive an instruction on voluntary manslaughter was "fact-specific" but, at a minimum, evidence of diminished capacity would "guarantee an instruction for second-degree murder." Defendant replied that she still had "issues" with her attorney admitting her guilt. The trial court explained, "[b]ut you understand that if you do not make that admission, she cannot utilize the diminished capacity defense, which would mean the jury will not get an instruction for second-degree murder[.]" Defendant then agreed her counsel could admit to her guilt in order to utilize a diminished capacity defense.

At trial, Defendant presented evidence tending to show she "had long exhibited evidence of mixed personality disorders exhibiting [a] clinically relevant degree of narcissism[.]" Defendant was diagnosed with Attentive Deficit Hyperactivity Disorder as a child, for which she was prescribed a stimulant, and had also received numerous sports-related concussions, resulting in "chronic post-concussive

syndrome." Both the use of stimulant medications and head injuries are risk factors for psychosis. Further, in late September 2018, Defendant experienced a "sudden precipitous onset of very significant paranoia" and was ultimately diagnosed with "unspecified psychosis." Defendant also presented evidence regarding her behavior during the time between her initial diagnosis of psychosis and the time of the killing.

Following the charge conference, in which the parties largely agreed on the jury instructions to be given, the trial court emailed counsel to inform them the jury would also receive an instruction on NGRI. Both over email and in person prior to closing arguments, defense counsel agreed to the instruction. There were no objections to the trial court's final instructions or verdict form.

During closing arguments, the State emphasized the premeditated nature of Defendant's actions. The State addressed both diminished capacity and NGRI. With respect to diminished capacity, the State told the jury: "You may find evidence that the defendant lacked mental – mental capacity at the time of the murder, whether the condition affected the defendant's ability to formulate the specific intent which is required for first-degree murder. It means you can consider second-degree murder, because it doesn't require specific intent. We covered that. She had the intent." The State contrasted this with NGRI and expressly noted Defendant had not asked for NGRI: "The defense did not ask you to find her not guilty by reason of insanity. Just to make sure you picked up on that. That's not what they're asking you for. . . . She's not raising insanity. She did not raise that defense." The trial court then instructed

the jury, including providing instructions on first-degree murder, second-degree murder, diminished capacity, and NGRI.

On 30 May 2023, the jury returned a verdict finding Defendant guilty of First-Degree Murder. The trial court sentenced her to life imprisonment without parole. Defendant gave oral Notice of Appeal in open court the same day.

## Issues

The issues on appeal reviewed in Part I are whether: (A) Defendant gave her knowing and voluntary consent to allow her attorney to tell the jury Defendant killed the victim; and (B) the trial court erred by providing a jury instruction on the defense of insanity. In Part II we determine whether the Record is sufficient to review Defendant's ineffective assistance of counsel (IAC) claims on direct review.

## Analysis

A.    Consent to Admission

Defendant contends the trial court misstated the law regarding the requirement she admit guilt to the murder in order to assert a defense of diminished capacity. Thus, in her view, her consent to her counsel making that admission of guilt was uninformed and, therefore, prejudicial error per se under *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985).

Although Defendant alleges a *Harbison* error occurred in her trial, the action she complains about is the trial court's colloquy with Defendant. We conclude the trial court's statements of law were not erroneous. However, to the extent

Defendant's alleged error on this issue relates to the conduct of her attorney in admitting her guilt, we view Defendant's argument on appeal as an ineffective assistance of counsel claim. Coupled with her other allegations of IAC, we address that issue separately.

"An instruction on diminished capacity is warranted where the evidence of defendant's mental condition is sufficient to cause a reasonable doubt in the mind of a rational trier-of-fact as to whether defendant had the ability to form the necessary specific intent to commit the crimes for which he is charged." *State v. Lancaster*, 137 N.C. App. 37, 44, 527 S.E.2d 61, 66-67 (2000) (citing *State v. Clark*, 324 N.C. 146, 163, 377 S.E.2d 54, 64 (1989)). "Diminished capacity is a means of negating the 'ability to form the specific intent to kill required for a first-degree murder conviction on the basis of premeditation and deliberation.' " *State v. Roache*, 358 N.C. 243, 282, 595 S.E.2d 381, 407 (2004) (quoting *State v. Page*, 346 N.C. 689, 698, 488 S.E.2d 225, 231 (1997), *cert. denied*, *Page v. North Carolina*, 522 U.S. 1056, 118 S. Ct. 710, 139 L. Ed. 2d 651 (1998)); *see also State v. Staten*, 172 N.C. App. 673, 685, 616 S.E.2d 650, 659 (2005) ("The defense of diminished capacity neither justifies nor excuses the commission of an offense, but rather negates only the element of specific intent[.]" (citing *State v. Holder*, 331 N.C. 462, 473-74, 418 S.E.2d 197, 203-04 (1992)). As such, it is "clearly inconsistent with a claim of innocence." *State v. Poindexter*, 359 N.C. 287, 291, 608 S.E.2d 761, 764 (2005). Indeed, an affirmative defense is "of the nature of a plea of confession and avoidance[.]" *State v. Caddell*, 287 N.C. 266, 282, 215

S.E.2d 348, 358 (1975) (quoting *State v. Creech*, 229 N.C. 662, 673, 51 S.E.2d 348, 356 (1949)). "An affirmative defense is one in which the defendant says, 'I did the act charged in the indictment, but I should not be found guilty of the crime charged because * * *.'" *Id.* at 289, 215 S.E.2d at 363.

Defendant contends the trial court erroneously informed her that evidence of diminished capacity would "guarantee" the jury would be instructed on second-degree murder and that receipt of a second-degree murder instruction "depend[ed] on" there being evidence of diminished capacity. Defendant argues no instruction can be guaranteed before evidence is presented and diminished capacity is not the only reason to instruct on second-degree murder.

In a colloquy with Defendant and her counsel, the trial court repeatedly referred to second-degree murder as a possible or potential instruction:

> [Trial Court]: However, that [diminished capacity defense] would require your attorney to make admission – to make an admission that you did in fact commit the murder; however, that it wasn't first-degree murder due to your diminished mental capacity. . . . Do you understand what I'm telling you?
>
> [Defendant]: Yeah. But then would – what would be considered then?
>
> [Trial Court]: *Potentially* second-degree murder.
>
> . . . .
>
> [Trial Court]: And did you inform [Defendant] at that time that [diminished capacity] would result in *potentially* a second-degree murder charge to the jury?

[Defense Counsel]: Potentially. And it could also result in a life-without-parole sentence.

. . . .

[Trial Court]: I haven't heard – the problem is I haven't heard the evidence to know whether or not this case would involve an instruction for voluntary manslaughter. I'm not trying to dance around your question; I don't know. . . . Maybe that's something [defense counsel] can enlighten you on. I'm certain she can enlighten you on that better than I can. She knows your case. She's been representing you on it. She knows what the facts are. I don't.

[Defendant]: All right.

[Trial Court]: But it would guarantee – a diminished capacity defense would guarantee an instruction for second-degree murder.

[Defendant]: But nothing less? That's what I don't understand.

[Trial Court]: I don't know if there would be anything less that would follow that. . . . Well it sounds like [defense counsel] told you that by utilizing diminished capacity a jury instruction for second-degree murder *is what would likely result*[.]

(emphasis added). The transcript reflects the trial court repeatedly communicated that an instruction on second-degree murder was possible if Defendant produced evidence of her diminished capacity. This is an accurate statement of the law. *See State v. Davis*, 349 N.C. 1, 35, 506 S.E.2d 455, 473-74 (1998) ("[T]he trial court properly instructed that if the jury found defendant could not form the specific intent required for first-degree murder, then it '*would* consider second degree murder.' Thus, the trial court properly conveyed the mandatory nature of this instruction."

(emphasis in original)).

Defendant also contends the trial court incorrectly suggested only evidence of diminished capacity could result in a second-degree murder instruction. Again, the transcript reflects the trial court's efforts to accurately explain the law to Defendant.

> [Trial Court]: Do you have any issue with [defense counsel] admitting that you are responsible for the homicide of the victim? So that – I'm sorry?
>
> [Defendant]: Yeah. I have issues with that.
>
> [Trial Court]: All right. Explain why you have issues with that.
>
> [Defendant]: Because it's her admitting.
>
> [Trial Court]: Okay. But you understand that if you do not make that admission, she cannot utilize the diminished capacity defense, which would mean the jury will not get an instruction for second-degree murder?
>
> [Defendant]: All right. She can use it.
>
> . . . .
>
> [Trial Court]: You do want [defense counsel] to utilize the diminished capacity defense?
>
> [Defendant]: Yes.
>
> [Trial Court]: So that the jury can receive an instruction for second-degree murder? Yes?
>
> [Defendant]: Yeah.

The trial court's statements, taken as a whole, accurately state the law with respect to diminished capacity and Defendant's entitlement to an instruction on second-

degree murder.

Thus, the trial court's statements to Defendant were correct statements of law. Therefore, the trial court did not err in instructing Defendant.

B.      Jury Instruction

Defendant contends the trial court committed plain error by instructing the jury on the defense of insanity without Defendant's consent and "in the absence of any evidence supporting the instruction." Importantly, Defendant's trial counsel agreed to the NGRI instruction, although Defendant had previously declined to plead NGRI.

Defendant contends we should apply a structural error analysis to these issues to consider how our courts should "protect a defendant's constitutional right to direct her own defense when the defendant's counsel throws away that right 'at trial.' " "Structural error is a rare form of constitutional error resulting from 'structural defects in the constitution of the trial mechanism' which are so serious that 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence.' " *State v. Garcia*, 358 N.C. 382, 409, 597 S.E.2d 724, 744 (2004) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10, 111 S. Ct. 1246, 1264-65, 113 L. Ed. 2d 302 (1991) (citation and quotation marks omitted)). But again, to the extent Defendant's complaint relies upon her counsel's acquiescence to the instruction, it is really about her trial counsel's conduct. Thus, we consider it another claim for ineffective assistance of counsel. We, therefore, limit our review of this issue here to

the instruction the trial court gave the jury on NGRI.

As Defendant acknowledges, she did not object to the instruction at trial, thus our review is limited to plain error. N.C.R. App. P. 10(a)(4) (2024) ("In criminal cases, an issue that was not preserved by objection noted at trial . . . nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.").

"For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citation omitted). Further, "[t]o show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.' " *Id.* (quoting *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citation omitted)). Thus, plain error is reserved for "the exceptional case where, after reviewing the entire record, it can be said the claimed error is a '*fundamental* error, something so basic, so prejudicial . . . that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused[.]' " *Odom*, 307 N.C. at 660, 300 S.E.2d at 378 (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)) (emphasis in original).

Defendant's argument is two-fold: the trial court erred by instructing the jury, first because Defendant had repeatedly refused to argue insanity, and second because

the evidence did not support the instruction. Even assuming arguendo the trial court's instruction was erroneous, Defendant has not established the prejudice necessary to meet the bar for plain error.

The trial court instructed the jury on the issues of diminished capacity and NGRI as follows:

> You may find there is evidence which tends to show that the defendant lacked mental capacity at the time of the acts alleged in this case. If you find that the defendant lacked mental capacity, you should consider whether this condition affected the defendant's ability to formulate the specific intent which is required for conviction of first-degree murder. In order for you to find the defendant guilty of first-degree murder, you must find beyond a reasonable doubt that the defendant killed the deceased with malice and in the execution of an actual, specific intent to kill formed after premeditation and deliberation. If, as a result of lack of mental capacity, the defendant did not have the specific intent to kill the deceased, formed after premeditation and deliberation, the defendant is not guilty of first-degree murder. Therefore, I charge that if, upon considering the evidence with respect to the defendant's lack of mental capacity, you have a reasonable doubt as to whether the defendant formulated the specific intent required for conviction of first-degree murder, you will not return a verdict of guilty of first-degree murder.
>
> . . . .
>
> When there is evidence which tends to show that the defendant was legally insane at the time of the alleged offense, you will consider this evidence *only if you find that the State has proved beyond a reasonable doubt each of the things about which I have already instructed you* [the elements of first-degree murder]. Even if the State does prove each of these things beyond a reasonable doubt, the defendant would nevertheless be not guilty if she was legally insane at the time of the alleged offense. I instruct you that sanity or soundness of mind is the natural and normal condition of people. Therefore, everyone is presumed sane

- 13 -

until the contrary is made to appear. The test of insanity as a defense is whether the defendant, at the time of the alleged offense, was laboring under such a defect of reason, from disease or deficiency of the mind, as to be incapable of knowing the nature and quality of the act or, if the defendant did know this, whether the defendant was, by reason of such defect of reason, incapable of distinguishing between right and wrong in relation to that act.

(emphasis added).

First and foremost, the jury in this case clearly rejected all affirmative defenses instructed upon because they found Defendant guilty of first-degree murder. Importantly, the instruction Defendant challenges correctly stated the law. *See State v. Evangelista*, 319 N.C. 152, 161, 353 S.E.2d 375, 382 (1987) (explaining elements of defense of insanity). And, indeed, the trial court instructed the jury it could only consider evidence of insanity if it first found the State had proven first-degree murder beyond a reasonable doubt. This includes—as the trial court expressly instructed—specific intent. Finding Defendant had a specific intent to kill means the jury rejected the defense of diminished capacity. *See Page*, 346 N.C. at 698, 488 S.E.2d at 231 ("A defendant is entitled to present evidence that a diminished mental capacity not amounting to legal insanity negated his ability to form the specific intent to kill required for a first-degree murder conviction on the basis of premeditation and deliberation." (citing *State v. Shank*, 322 N.C. 243, 249, 367 S.E.2d 639, 643 (1988))). Thus, to find Defendant guilty of first-degree murder, the jury must have first rejected the defense of diminished capacity and then rejected the defense of insanity.

Defendant contends the jury instruction on insanity, coupled with the State's

closing argument, may have confused the jury as to the defense of diminished capacity. However, in its closing argument, the State expressly differentiated between NGRI and diminished capacity:

> Let's talk about diminished capacity. This is essentially what [defense counsel] argued to you. Diminished capacity. You may find evidence that the defendant lacked mental – mental capacity at the time of the murder, whether the condition affected the defendant's ability to formulate the specific intent which is required for first-degree murder. It means you can consider second-degree murder, because it doesn't require the specific intent. We covered that. She had the intent.
>
> . . . .
>
> We've talked about not guilty by reason of insanity. Which [Defendant]'s not asking for. The defense did not ask you to find her not guilty by reason of insanity. Just to make sure you picked up on that. That's not what they're asking you for. . . . She's not raising insanity. She did not raise that defense.

These statements demonstrate that, taken as a whole, the State's closing argument differentiated NGRI and diminished capacity as separate defenses, correctly articulated which Defendant had asserted, and correctly stated the elements of the defenses.

Thus, based on the Record before us, Defendant has not shown the allegedly erroneous instruction "had a probable impact on the jury's finding that the defendant was guilty." *Lawrence*, 365 N.C. at 517, 723 S.E.2d at 333 (quoting *Odom*, 307 N.C. at 660, 300 S.E.2d at 378 (citation omitted)). Therefore, any error in the trial court's jury instruction does not constitute plain error.

## II. Ineffective Assistance of Counsel

STADING, Judge.

For Defendant to successfully assert a claim for ineffective assistance of counsel, she must satisfy a two-part test. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). Defendant must first show that her attorney's performance "fell below an objective standard of reasonableness." *State v. Blakeney*, 352 N.C. 287, 307, 531 S.E.2d 799, 814–15 (2000) (citation omitted). She must next show the error committed was so serious that "a reasonable probability exists that the trial result would have been different absent the error." *Id.* at 307–08, 531 S.E.2d at 815 (citation omitted). That said, in *State v. Harbison*, our Supreme Court held, "that a criminal defendant suffers a per se violation of his constitutional right to effective assistance of counsel when his counsel concedes the defendant's guilt to the jury without his prior consent." *State v. McAllister*, 375 N.C. 455, 456, 847 S.E.2d 711, 712 (2020).

### A. Admission of Guilt

Defendant challenges the assertion that her attorney, Ms. Gibson, had permission to admit her guilt. *See State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985). However, the trial court conducted an inquiry sufficiently showing Defendant knowingly and voluntarily consented to her attorney's admission of her guilt—in furtherance of her defense. *See State v. McAllister*, 375 N.C. at 477, 847 S.E.2d at 724 (citation omitted) ("This Court has stated 'that an on-the-record exchange

between the trial court and the defendant is the preferred method of determining whether the defendant knowingly and voluntarily consented to an admission of guilt . . . ."). Although Defendant initially expressed confusion and disagreement with admitting guilt, the trial court's complete colloquy with Defendant at the outset of trial provides a clear display of her understanding and consent to her attorney's admission:

> THE COURT: You've spoken to Ms. Gibson about the diminished capacity defense; is that correct?
>
> DEFENDANT: Yeah.
>
> THE COURT: All right. Are you satisfied you, at least in your mind, understand the diminished capacity defense that Ms. Gibson has spoken to you about?
>
> DEFENDANT: For the most part.
>
> THE COURT: All right. Is there something you don't understand about that diminished capacity defense?
>
> DEFENDANT: No. No.
>
> THE COURT: There's not?
>
> DEFENDANT: No.
>
> THE COURT: Okay. Do you understand that in order -- at least Ms. Gibson's position is in order to utilize that diminished capacity defense, that will require an admission on your part?
>
> DEFENDANT: No. I don't really understand that part.
>
> THE COURT: All right. It will require an admission that you in fact did -- you were responsible for the death of the victim.

DEFENDANT: Well, she really didn't explain all that to me so --

THE COURT: Do you understand that?

DEFENDANT: Not exactly. I don't understand why it's part of the defense.

THE COURT: Well, Ms. Gibson has provided notice that you lacked the proper mental capacity to commit first-degree murder in that you were not able to form the state of mind necessary for that type of murder. That your mental capacity was diminished to the point that you could not do that. Do you understand that part?

DEFENDANT: Yeah.

THE COURT: However, that would require your attorney to make admission -- to make an admission that you did in fact commit the murder; however, that it wasn't first-degree murder due to your diminished mental capacity.

DEFENDANT: Okay.

THE COURT: Do you understand that? Do you understand what I'm telling you?

DEFENDANT: Yeah. But then would – what would be considered then?

THE COURT: Potentially second-degree murder.

DEFENDANT: No. I don't understand that part.

THE COURT: You don't understand that part?

DEFENDANT: No.

THE COURT: All right. Second-degree murder does not require premeditation or deliberation. First-degree murder requires premeditation and deliberation. So Ms. Gibson's defense -- by utilizing diminished capacity, her position on your behalf would be that you did not have the mental

capacity to form premeditation and deliberation.

DEFENDANT: But it can't be anything lesser than that?

THE COURT: Anything lesser than that?

DEFENDANT: Than second? So it's not the paper that she showed me?

THE COURT: What's the paper that Ms. Gibson showed you?

DEFENDANT: Diminished capacity.

THE COURT: Ms. Gibson, do you want to enlighten me? I'm not sure --

MS. GIBSON: What I have verbally explained to Miss Copenhaver -- I gave her an article that was written -- I'm not sure if it was Jeff Wel[t]y or another person that --

THE COURT: John Rubin?

MS. GIBSON: Yes.

THE COURT: Okay.

MS. GIBSON: Gave her that. And then about three weeks ago, I sent her a three-page letter explaining the different options, and one of the sections was diminished capacity, explaining that by asserting that defense she would be admitting that she committed the murder, but lacked the intent to form premeditation.

THE COURT: Okay. And did you inform Miss Copenhaver at that time that that would result in potentially a second-degree murder charge to the jury?

MS. GIBSON: Potentially. And it could also result in a life-without-parole sentence.

THE COURT: Okay.

DEFENDANT: And also something could be lesser than that too. That's what the article says.

MS. GIBSON: I think she's probably thinking of manslaughter.

THE COURT: Yes.

MS. GIBSON: Because I think, as you said --

THE COURT: That's fact-specific, Miss Copenhaver. That doesn't mean that necessarily in your case that it would result in a jury instruction for voluntary manslaughter.

DEFENDANT: Yeah. I'm just trying to understand like if that's possible in this defense with regards to those two options.

THE COURT: I haven't heard -- the problem is I haven't heard the evidence to know whether or not this case would involve an instruction for voluntary manslaughter. I'm not trying to dance around your question; I don't know.

DEFENDANT: Okay.

THE COURT: Maybe that's something Ms. Gibson can enlighten you on. I'm certain she can enlighten you on that better than I can. She knows your case. She's been representing you on it. She knows what the facts are. I don't.

DEFENDANT: All right.

THE COURT: But it would guarantee -- a diminished capacity defense would guarantee an instruction for second-degree murder.

DEFENDANT: But nothing less? That's what I don't understand.

THE COURT: I don't know if there would be anything less that would follow that. So -- yes, ma'am?

MS. GIBSON: I think I should put on the record now that I do not believe that the evidence is going to support a jury instruction of manslaughter.

. . . .

DEFENDANT: That's not what she told me about when I agreed to this defense.

THE COURT: Well, it sounds like Ms. Gibson told you that by utilizing diminished capacity a jury instruction for second-degree murder is what would likely result, which is significantly different than a jury instruction for first-degree murder. First-degree murder jury instruction -- well, first-degree punishment is life in prison without parole. Do you understand that?

DEFENDANT: Yeah.

THE COURT: For second-degree -- and that's no matter what your prior record level is.

For second-degree murder, of course, it's still potentially life in prison without parole. However, depending on your prior record, it does not require life without parole. First-degree murder conviction requires life without parole; second-degree murder does not require life without parole. Do you understand that?

DEFENDANT: Yeah.

THE COURT: So knowing that, are you authorizing Ms. Gibson to make that admission and utilize the defense of diminished capacity on your behalf as a trial strategy?

DEFENDANT: I don't know. She didn't really explain that much to me, so I guess I have to think about it.

THE COURT: Well, you don't really have time to think about it, Miss Copenhaver. This is your day of trial. It starts today.

DEFENDANT: Then yes.

THE COURT: I'm sorry?

DEFENDANT: Yes.

THE COURT: Ms. Gibson, for the record, when did you have this conversation with Miss Copenhaver?

MS. GIBSON: We've been having the conversation for months. Her consent, I believe, came probably six weeks ago. My letter explaining it to her was three weeks ago. I met with her last Thursday at the jail to again talk about NGRI versus diminished capacity. I was not received well. So I will put on the record that counsel has made every effort possible to explain this to her. And she has not been cooperative or talkative with me. So I've made every effort. But I will say this on the record also: If she has any doubt about the defense of diminished capacity and making the admissions that she committed the murder, I do not and will not go forward with that defense.

THE COURT: Miss Copenhaver, I'm not trying to be difficult. Take your mask off for me. Okay? Do you have any issue with Ms. Gibson admitting that you are responsible for the homicide of the victim? So that – I'm sorry?

DEFENDANT: Yeah. I have issues with that.

THE COURT: All right. Explain why you have issues with that.

DEFENDANT: Because it's her admitting.

THE COURT: Okay. But you understand that if you do not make that admission, she cannot utilize the diminished capacity defense, which would mean the jury will not get an instruction for second-degree murder?

DEFENDANT: All right. She can use it.

THE COURT: I'm sorry?

DEFENDANT: She can use it then.

> THE COURT: So what I'm hearing you say is you want the jury to receive an instruction for second-degree murder, and in order for --
>
> DEFENDANT: Diminished capacity defense.
>
> THE COURT: You do want her to utilize the diminished capacity defense?
>
> DEFENDANT: Yes.
>
> THE COURT: So that the jury can receive an instruction for second-degree murder? Yes?
>
> DEFENDANT: Yeah.
>
> THE COURT: Are you sure?
>
> DEFENDANT: Yeah.

Considering the above exchange, it is clear Defendant's counsel informed her of the requirements for the defense of diminished capacity. Defendant was informed of these requirements weeks before her decision, and the trial court obtained her consent upon a clear and careful explanation. The trial court conducted an additional colloquy with Defendant after the charge conference and before closing arguments:

> THE COURT: All right. And prior to trial -- Miss Copenhaver, if you'll stand up for me, please, ma'am. Prior to trial, Miss Copenhaver, you and I had a discussion about potential admissions by Ms. Gibson as it relates to diminished capacity. Do you remember that discussion?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And you approved that admission; is that correct?
>
> THE DEFENDANT: Yes.

THE COURT: Regarding potentially admitting the murder but with diminished capacity. Is that an accurate statement on my part?

THE DEFENDANT: Yes.

THE COURT: And you still approve of the same?

THE DEFENDANT: Yeah.

THE COURT: All right. You can be seated.

Here, since the record contains sufficient information to resolve Defendant's allegation, it is properly reviewed by this Court. *See id.* In view of the record, we hold Defendant's attorney's performance did not amount to a *Harbison* error. *See State v. Bryant*, 281 N.C. App. 116, 126–27, 867 S.E.2d 580, 587 (2021) ("[W]e conclude to the extent defense trial counsel's admissions in opening statements triggered *Harbison*, the trial court's colloquy with Defendant in this case was adequate to ascertain Defendant's consent to those admissions. Consequently, Defendant was not per se denied effective assistance of counsel."); *see also State v. Foreman*, 270 N.C. App. 784, 792, 842 S.E.2d 184, 189 (2020) ("As Defendant's consent to his attorney's concession of guilt was knowing and voluntary, he was not denied effective assistance of counsel in violation of *Harbison*.").

## B. Jury Instruction

Defendant also argues that she was denied effective assistance of counsel because her attorney did not object to the trial court's jury instruction on not guilty by reason of insanity. Defendant claims her attorney was bound to comply with her

desire to object to the instruction. Her ineffective assistance of counsel argument on this basis fares no better than her first. Even if her attorney was bound to follow her request, she cannot show prejudice to her defense. *See Strickland*, 466 U.S. at 671, 104 S. Ct. at 2056 ("With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

We also acknowledge Defendant's alternative argument alleging her attorney's failure to object to the not guilty by reason of insanity jury instruction contributed to structural error under *State v. Payne,* 256 N.C. App. 572, 808 S.E.2d 476 (2017). The dissent similarly suggests *Payne* is applicable to resolve Defendant's IAC claim. But *Payne* does not consider whether the Defendant received IAC. Instead, it addresses whether the trial court erred in "allow[ing] her lawyer to pursue a pre-trial insanity defense against [the defendant's] wishes . . . ." *Id*. at 577, 808 S.E.2d at 480–81.

Even if *Payne* applied, it applied *Harbison*:

> Though *Harbison* dealt with the consequences of a defendant's attorney admitting defendant's guilt to certain charges without the defendant's consent, in light of . . . precedent, we find the following reasoning in *Harbison* applicable to the present case:
>
> This Court is cognizant of situations where the evidence is so overwhelming that a plea of guilty [or NGRI] is the best trial strategy. However, the gravity of the consequences

demands that the decision to plead guilty [or NGRI] remain in the defendant's hands. When counsel admits his client's guilt [or moves for a pretrial determination of NGRI] without first obtaining the client's consent, the client's rights to a fair trial and to put the State to the burden of proof are completely swept away. . . . [ ] Counsel in such situations denies the client's right to have the issue of guilt or innocence decided by a jury.

*Payne*, 256 N.C. App. at 584–85, 808 S.E.2d at 485 (citing *Harbison*, 315 N.C. at 180, 337 S.E.2d at 507). But *Payne* is inapplicable to instant case for other reasons.

In *Payne*, the defendant's attorney, against the defendant's express wishes, "moved for a pretrial determination of NGRI pursuant to N.C. [Gen. Stat.] 15A-959(c), the State consented, and the trial court agreed—purportedly dismissing the charges against Defendant based upon its determination that she was NGRI." *See generally Payne*, 256 N.C. App. at 578, 808 S.E.2d at 480. Then, the trial court "entered 'an order finding that [D]efendant ha[d] been found not guilty by reason of insanity of a crime and committ[ed her] to a Forensic Unit . . .' until such time as Defendant should be released 'in accordance with Chapter 122C of the General Statutes.'" *Id.* (brackets in original). On appeal, this Court concluded, "by allowing Defendant's counsel to seek and accept a pretrial disposition of NGRI, the trial court 'deprived [Defendant] of [her] constitutional right to conduct [her] own defense.'" *Id.* at 585, 808 S.E.2d at 485 (citation omitted) (brackets in original).

The *Payne* Court determined, "[b]y ignoring Defendant's clearly stated desire to proceed to trial rather than moving for a pretrial verdict of NGRI . . . the trial court

allowed . . . the 'waiver' of her fundamental rights . . . ." *Id.* at 585, 808 S.E.2d at 485. The Court continued, "[t]he denial of Defendant's right to counsel advocating for her wishes, which resulted in the denial of Defendant's right to trial and her indefinite involuntary commitment pursuant to N.C.G.S. § 15A-959(c) and N.C.G.S. § 15A-1321(b), constituted reversible error." *Id.* at 586, 808 S.E.2d at 486. In this matter, Defendant's attorney made no such concession that led to her commitment. This Court has since followed *Payne*, yet has not extended its ruling to the present situation—IAC by failure to object to jury instructions. *See In re T.S.P.,* 260 N.C. App 127, 814 S.E.2d 923 (2018); *see also State v. Myrick*, 277 N.C. App. 112, 113, 857 S.E.2d 545, 546 (2021). Given the patent factual and procedural differences, we decline to expand the boundaries of the *Payne* ruling to this case. *Strickland* is the proper paradigm for this analysis. 466 U.S. 668, 687, 104 S. Ct. 2052, 2064.

Here, applying *Strickland*, the cold record does not contain the requisite information to determine whether Defendant's trial counsel's performance was deficient. *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001) (citing *Strickland*, 466 U.S. at 687–88, 104 S. Ct. at 2064) ("An IAC claim must establish both that the professional assistance defendant received was unreasonable and that the trial would have had a different outcome in the absence of such assistance."). Assuming *arguendo*, that Defendant's attorney rendered deficient performance, the record reveals Defendant cannot establish prejudice to her defense. *See State v. Oglesby*, 382 N.C. 235, 248, 876 S.E.2d 249, 260 (2022) ("[The defendant's] IAC claim

is properly disposed of on prejudice grounds alone."). Defendant cannot show a reasonable probability that the trial result would have been different absent her attorney's failure to object to this instruction. *See Blakeney*, 352 N.C. at 307–08, 531 S.E.2d at 815 ("Second, once defendant satisfies the first prong, he must show that the error committed was so serious that a reasonable probability exists that the trial result would have been different absent the error."). The jury's verdict likewise supports this outcome since it shows the jury did not find Defendant not guilty by reason of insanity. Since Defendant cannot show her attorney's performance, even if deficient, prejudiced her defense, she cannot meet the second prong of the *Strickland* test. 466 U.S. at 687, 104 S. Ct. at 2064. We therefore hold Defendant has not established a claim for ineffective assistance of counsel.

## **Conclusion**

Accordingly, for the foregoing reasons, we conclude there was no error in Defendant's trial and affirm the Judgment. We dismiss Defendant's IAC claims.

NO ERROR IN PART; DISMISSED IN PART.

Judge FLOOD concurs.

Judge HAMPSON concurs in part and dissents in part by separate opinion.

HAMPSON, Judge, dissenting in part.

This Court's consistent practice is to dismiss IAC claims without prejudice to allow defendants to have their claims considered through a motion for appropriate relief. *See State v. Dockery*, 78 N.C. App. 190, 192, 336 S.E.2d 719, 721 (1985) ("The accepted practice is to raise claims of ineffective assistance of counsel in post-conviction proceedings, rather than direct appeal."); *State v. Ware*, 125 N.C. App. 695, 697, 482 S.E.2d 14, 16 (1997) (dismissing the defendant's appeal because issues could not be determined from the record on appeal and stating that to "properly advance these arguments, defendant must move for appropriate relief pursuant to G.S. 15A-1415[.]"). This is not to say this Court may never consider IAC claims on direct appeal, but rather that the cases in which direct review is appropriate are limited—particularly in light of the gravity of defendants' interests at stake.

"IAC claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." *State v. Fair,* 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001) (citations omitted). But a "cold record", however lengthy, does not enable us to ascertain significant, non-verbal aspects of communication, such as tone and body language. Thus, "[s]imply stated, the trial court is in a better position to determine whether a counsel's performance: (1) was deficient so as to deprive defendant of 'counsel' guaranteed under the Sixth Amendment; and (2) prejudiced

defendant's defense to such an extent that the trial was unfair and the result unreliable." *State v. Streater*, 197 N.C. App. 632, 649, 678 S.E.2d 367, 378 (2009) (quoting *State v. Duncan*, 188 N.C. App. 508, 517, 656 S.E.2d 597, 603 (2008) (Hunter, J., dissenting), *disc. rev. improvidently allowed, reversed*, 362 N.C. 665, 666, 669 S.E.2d 738, 738 (2008) ("For the reasons stated in the dissenting opinion of the Court of Appeals, the decision of the Court of Appeals is reversed[.]")). We have repeatedly recognized the trial court is best positioned to make credibility determinations and, accordingly, we limit our forays into such issues.

Moreover, "because of the nature of IAC claims, defendants likely will not be in a position to adequately develop many IAC claims on direct appeal." *Fair*, 354 N.C. at 167, 557 S.E.2d at 525. Further, in order to "defend against ineffective assistance of counsel allegations, the State must rely on information provided by defendant to trial counsel, as well as defendant's *thoughts, concerns, and demeanor*." *State v. Buckner*, 351 N.C. 401, 412, 527 S.E.2d 307, 314 (2000) (citation omitted) (emphasis added). "Only when all aspects of the relationship are explored can it be determined whether counsel was reasonably likely to render effective assistance." *Id.* (quoting *State v. Taylor*, 327 N.C. 147, 161, 393 S.E.2d 801, 810 (1990) (Meyer, J., dissenting) (citation omitted)). I do not believe the issues involved in this case are as clear-cut as the majority suggests. Recognizing the limitations of our review on appeal, I would dismiss Defendant's IAC claim without prejudice to the filing of a motion for appropriate relief in the trial court.

Here, Defendant's IAC claim is two-fold: first, her colloquy with the trial court regarding her understanding of the requirements to assert a defense of diminished capacity; second, her attorney's acquiescence to the trial court's instruction on NGRI.

As to Defendant's colloquy with the trial court regarding the use of a diminished capacity defense, although I do not believe the trial court's statements were incorrect, the transcript reflects potential confusion on Defendant's part as to the nature of the defense and her admission of guilt. Defendant stated she understood the diminished capacity defense "[f]or the most part," yet when the trial court asked specifically about the admission of guilt required to use that defense, Defendant replied "No. I don't really understand that part." Defendant told the trial court her attorney "didn't explain all that to me" about the admission of guilt. Although the trial court attempted to explain the required admission of guilt to Defendant, her attorney claimed she had done so as well; the Record, however, reflects Defendant had potentially lingering confusion. And, indeed, although Defendant stated at multiple points that her attorney had not explained aspects of diminished capacity to her, her attorney told the trial court "We've been having the conversation for months. . . . My letter explaining [diminished capacity] to her was three weeks ago. . . . I will put on the record that counsel has made every effort possible to explain this to her."

To be sure, the above reflects efforts to explain diminished capacity to Defendant. What it does not clearly and unequivocally show, however, is whether

3

Defendant in fact understood.  The Record reflects Defendant's attorney spent weeks attempting to explain diminished capacity to her—yet she expressed continued confusion.  To infer she entirely understood the trial court's explanation across ten pages of the transcript when she did not understand after repeated conversations with her attorney is too far of a leap for this Court to make.

I believe this leap is particularly inappropriate in light of the constraints of the conversation between Defendant and the trial court.  Defendant expressly stated she needed time to think about the admission of guilt required for diminished capacity, to which the trial court responded: "Well, you don't really have time to think about it[.]  This is your day of trial.  It starts today."  The Record does seem to reflect Defendant wanted the jury to be instructed on a lesser offense than first-degree murder, as she repeatedly asked about second-degree murder and voluntary manslaughter.  Defendant agreed to the admission of guilt only *after* the trial court told her "if you do not make that admission, she cannot utilize the diminished capacity defense, which would mean the jury will not get an instruction for second-degree murder[.]"  I do not suggest the trial court behaved improperly here; rather, I believe this transcript alone, considering the pressures Defendant may have felt to decide in the moment—which we cannot know or judge—is not sufficient to definitively dismiss her IAC claim on this issue.

As to Defendant's IAC claim regarding the trial court's instruction on NGRI and her counsel's failure to object to the instruction, the majority quickly disposes of

Defendant's claim because, in their view, she cannot show she was prejudiced by the instruction. It is unclear why they believe this is so. But in any event, not every error requires a showing of prejudice. In *Harbison*, our Supreme Court concluded a defendant whose attorney admits guilt without their consent "need not show any specific prejudice in order to establish his right to a new trial due to ineffective assistance of counsel." 315 N.C. at 179, 337 S.E.2d at 507. Whether a trial court instructing the jury on a defense a defendant has affirmatively stated she does not wish to raise is structural error, *Harbison* error, or simply subject to our typical error/plain error analysis is not clear from our caselaw.

In *Harbison*, our Supreme Court acknowledged "there exist 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.' " *Id.* (quoting *United States v. Cronic*, 466 U.S. 648, 658, 104 S. Ct. 2039, 2046, 80 L. Ed. 2d 657 (1984)). *Harbison* merely identified one such circumstance. Then, in *State v. Payne,* 256 N.C. App. 572, 808 S.E.2d 476 (2017), this Court considered whether a competent defendant has the right to refuse to pursue a defense of NGRI. That case presented an issue of first impression for North Carolina Courts, and we looked to other jurisdictions for guidance. The *Payne* Court first noted the D.C. Circuit Court of Appeals had "initially held 'a defendant may not keep the issue of insanity out of the case altogether. He may, if he wishes, refuse to raise the issue of insanity, but he may not, in a proper case, prevent the court from injecting it.' " *Id.* at 579, 808 S.E.2d at 482 (quoting *Whalem v. United States*, 346

F.2d 812, 818 (D.C. Cir. 1965)). However, the D.C. Circuit later overturned *Whalem*, recognizing "[n]o other federal court of appeals has imposed a duty upon the district court to raise the insanity defense; indeed, only a few have even considered the issue." *United States v. Marble*, 940 F.2d 1543, 1545 (D.C. Cir. 1991) (citations omitted).

In concluding a competent defendant has the right to determine whether or not to plead NGRI, the *Payne* Court pointed to the structure of the Sixth Amendment:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make h[er] defense. . . . The counsel provision supplements this design. It speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant[.]

*Payne*, 256 N.C. App. at 581, 808 S.E.2d at 483 (quoting *Faretta v. California*, 422 U.S. 806, 819-20, 95 S. Ct. 2525, 2533, 45 L. Ed. 2d 562 (1975)).

Here, although defense counsel did not enter a plea of NGRI on Defendant's behalf, she did acquiesce without objection to the trial court giving that instruction despite Defendant's repeated, unwavering statements she did not wish to present NGRI to the jury. If, as both federal and North Carolina caselaw make clear, a defendant's counsel is her "assistant," is such a failure to act in contravention of a defendant's known and expressed wishes, ineffective assistance per se? In such circumstances, should a defendant be required to show prejudice? Or is this, as in *Harbison*, a situation "so likely to prejudice the accused that the cost of litigating [its]

6

effect in a particular case is unjustified"? 315 N.C. at 179, 337 S.E.2d at 507 (citation and quotation marks omitted). I do not believe this Court can or should answer that question absent additional proceedings in the trial court. Again, although the trial court's instruction was a correct statement of law, we have no way of knowing what would have happened had Defendant's counsel objected to the NGRI instruction. And the extent to which failing to act in accordance with a defendant's express wishes constitutes prejudice per se is an inquiry properly fleshed out in the trial court.

Further, in my view, the trial court is the proper venue for the parties to make their arguments with respect to whether defense counsel's inaction in this case constitutes structural error or *Harbison* error or neither. These claims should be developed in the trial court to create an adequate record in case of appeal. This is borne out by the majority's failure to reckon with Defendant's contentions regarding structural and *Harbison* error or to meaningfully explain why they believe this is neither structural error nor *Harbison* error.

I would thus conclude further development of the arguments is required before we can properly apply the *Strickland* test or determine whether another test is appropriate in this case. Therefore, I would dismiss Defendant's IAC claims without prejudice to permit Defendant to pursue a motion for appropriate relief in the trial court. Consequently, I respectfully dissent.